# THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 129

OCTOBER TERM, A.D. 2025

December 9, 2025

SCOTT HUNTER and HEATHER HUNTER,
as next friends and parents of LH, a minor
child,

Appellants
(Plaintiffs),

v.

UNIVERSAL PRECAST CONCRETE, INC.,
and UPC PARKS, a Division of Universal
Precast Concrete, Inc., a California
corporation; MIRACLE RECREATION
EQUIPMENT COMPANY, an Iowa
corporation; CHURCHICH RECREATION
EQUIPMENT, LLC., a Colorado corporation;
and LARAMIE COUNTY SCHOOL
DISTRICT #1, a Wyoming local government,

Appellees
(Defendants).

S-25-0026

*Appeal from the District Court of Laramie County*
*The Honorable Peter H. Froelicher, Judge*

*Representing Appellants:*
> John G. Knepper of Law Office of John G. Knepper, LLC, and Frederick J. Harrison, Cheyenne, Wyoming. Argument by Mr. Knepper.

*Representing Appellees Universal Precast Concrete, Inc., and UPC Parks:*
> Mistee L. Elliott and Holly L. Tysse of Crowley Fleck, PLLP, Sheridan, Wyoming. Argument by Ms. Elliott.

*Representing Appellees Miracle Recreation Equipment, LLC, and Churchich Recreation Equipment, LLC:*

Stuart R. Day of Williams, Porter, Day & Neville, P.C., Casper, Wyoming. Argument by Mr. Day.

*Representing Appellee Laramie County School District #1:*

Sean W. Scoggin of Williams, Porter, Day & Neville, P.C., Cheyenne, Wyoming. Argument by Mr. Scoggin.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, JAROSH, and HILL, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL, Justice.**

[¶1]    After their daughter was injured, Scott and Heather Hunter as next friends and parents of LH (the Hunters) filed suit against multiple parties including Universal Precast Concrete, Inc., UPC Parks, Miracle Recreation Equipment Company, Churchich Recreation Equipment, LLC, and Laramie County School District #1.  Over the course of the case and after considerable delay, the district court granted summary judgment for the business defendants and, following a mistrial, ultimately dismissed the remainder of the Hunters' case with prejudice as a sanction for the conduct of the Hunters' counsel.  The Hunters appeal arguing that the district court erred in several of its rulings.  We affirm in part and reverse in part.

## ISSUES

[¶2]    The Hunters identify three issues, which we rephrase and reorder as follows:

> 1) Did the district court err when it excluded several of the Hunters' experts?
>
> 2) Did the district court err when it granted summary judgment?
>
> 3) Did the district court abuse its discretion when it dismissed the Hunters' case with prejudice?

## FACTS

[¶3]    This case originates from the Hunters' allegations that in 2018 LH was injured on a piece of playground equipment called "Rocks and Ropes" at Meadowlark Elementary School in Cheyenne.  Rocks and Ropes is designed with two ropes suspended between two large rocks.  While playing on Rocks and Ropes, children stand on the bottom rope while holding the top rope to maintain their balance.  The Hunters alleged that LH was standing on the bottom rope and holding the top rope when a boy either jumped or fell onto the ropes, grabbing the top rope with his hands and landing his feet on the bottom rope.  The Hunters claimed that when the boy jumped or fell onto the ropes it caused LH to move backwards and forwards with significant force.

[¶4]    The Hunters alleged that LH then went to see the school nurse, who gave her ibuprofen and sent her back to class.  They claim the nurse made no notes of LH's visit and did not inform the Hunters of the incident.  Three weeks later, because she had back pain, the Hunters took LH to the doctor.  The doctor diagnosed her with a crushed T5 vertebra.

1

[¶5]	In January of 2020, the Hunters filed suit against Universal Precast Concrete and its subsidiary UPC Parks (UPC), Miracle Recreation Equipment Company (Miracle), Churchich Recreation Equipment, LLC (Churchich), and Laramie County School District #1 (the School District).[1]	The Hunters alleged the Business Defendants designed, manufactured, sold, and installed Rocks and Ropes, which was defective because there was too much slack in the ropes for multiple users.	The Hunters sought to recover under theories of strict product liability; breach of the warranty of merchantability and fitness for a particular purpose; and breach of the warranty of performing the design, manufacture, transport, and installation in good and workmanlike fashion.	The Hunters also made negligence claims asserting that the Business Defendants negligently designed, manufactured, transported, and installed Rocks and Ropes.	They additionally claimed these defendants failed to provide adequate warnings about the risks associated with Rocks and Ropes.

[¶6]	The Hunters made claims against the School District alleging it was negligent in its operation and supervision of the playground.	They also alleged that the school nurse negligently provided medical care when LH complained of back pain.

[¶7]	The procedural history related to this case is rather lengthy, but because the dismissal was based in part on the failure to prosecute, it is necessary to summarize some of that history here.	We find it most efficient to do so in a chronological bullet point fashion:

*First Scheduling Order*

- The Hunters served all the parties in February of 2020.

- In March of 2020, both President Trump and Governor Gordon declared COVID-19 a public health emergency. Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 18, 2020); 300 Wyo. Gov't Reg. 300-1 (LexisNexis March 2020).

- On July 29, 2020, the district court issued a general order requiring action, noting the Hunters' case would be dismissed if no action occurred in 30 days.

- The Hunters requested a scheduling conference, which the clerk filed on August 31, 2020.

- The court held a scheduling conference resulting in an initial schedule which included, among other things, dates for expert witness designations, a discovery cut-off, dispositive motions, and an August 16, 2021, trial.

---

[1] When discussing all of the defendants we will refer to them collectively as the Defendants.  We will refer to UPC, Miracle, and Churchich collectively as the Business Defendants.

- Between December 3, 2020, and February 9, 2021, the Hunters filed four unopposed motions to extend many of the deadlines set in the scheduling order for various reasons, including that the COVID pandemic had delayed discovery. The district court granted all the motions and adjusted the schedules accordingly.

- On April 23, 2021, the Hunters filed a discovery report detailing discovery problems, including the need for additional discovery.

- On May 13, 2021, the Defendants filed a motion to vacate the initial scheduling order including the trial date. The motion detailed problems completing discovery. The Hunters objected to the motion to vacate the scheduling order.

- Receiving no response from the district court on their motion to vacate, some of the Defendants, in compliance with the previous scheduling orders, filed motions for summary judgment on June 1, 2021.

- On June 11, 2021, over the Hunters' objection, the district court granted the motion to vacate the August trial date. Trial was reset for May 9, 2022. The district court again adjusted the discovery and motion deadlines.

*Second Scheduling Order*

- Between June of 2021 and January of 2022, the parties filed additional motions to extend various deadlines, which the district court generally granted without comment.

- On January 7, 2022, all the parties requested a scheduling conference noting personal issues with experts and that the Hunters' counsel had COVID.

- On January 19, 2022, the Defendants moved to amend the scheduling order and vacate the trial date. The Hunters did not object to the changes in other deadlines but did object to vacating the trial date.

- After the scheduling conference, the district court reset the trial date to September 12, 2022, and adjusted the discovery and motions deadlines.

*Vacation of the September 2022 trial date*

- On May 26, 2022, the parties filed a request for an extension of the deadlines for *Daubert* and dispositive motions. The district court granted the extensions.

3

- On June 3, 2022, the Defendants renewed their prior summary judgment motions originally filed in June of 2021. The Defendants also filed multiple *Daubert* motions to strike the Hunters' experts. The district court set a hearing for the summary judgment and *Daubert* motions for July 15, 2022.

- On June 22, 2022, the Hunters filed a motion for a one-week extension to respond to the Defendants' motions given the number of motions requiring a response. The district court granted the extension. In a handwritten note, the court stated, "[a]s a result of the two recent deadline extensions, the court will likely need to reset the current trial date. The parties should be prepared to discuss resetting the trial day at the hearing scheduled for July 15, 2022."

- On June 24, 2022, the Hunters filed their Rule 56.1 statement of disputed facts and response to the Defendants' motions for summary judgment.

- On June 30, 2022, the Hunters filed an opposition to the multiple motions to exclude their experts and in turn challenged three of the Defendants' experts.

- At the July 15, 2022, summary judgment and *Daubert* hearing, the district court noted that it would review but could not possibly resolve all motions before the scheduled September 2022 trial date. The district court reset the trial for March 13, 2023.

- On September 28, 2022, the district court excluded five of the Hunter's expert witnesses, in whole or in part, and granted summary judgment to the Business Defendants but not to the School District. The district court's reasoning regarding the experts and summary judgment will be discussed below.

### *Vacation of the March 2023 trial*

- In February of 2023, the School District and the Hunters filed trial motions. The Hunters also filed a motion for relief citing Rule 60(b), asking the court to reconsider the exclusion of some expert testimony. The court denied the Hunters' motion. Among other things, the court ruled the motion was untimely because it should have been filed more than one month before trial and that the Hunters had failed to provide clear proof the earlier *Daubert* rulings were incorrect.

- On March 7, 2023, the Hunters asked for a continuance because counsel had learned that one of their experts was seriously ill with a viral and bacterial respiratory infection. The district court reset the trial for November 2, 2023, as the second case on the trial stack. The court ordered the resetting was of the trial

4

date only.  The court limited the parties to the witness and final exhibit lists already filed for the March 2023 trial date.  The court specifically stated, "[the Hunters]' requested continuance is a resetting of the trial date only" and that "[n]o additional discovery or supplementation of witnesses, exhibits, or other evidence is permitted, and the parties will remain bound by the designations of witnesses' anticipated testimony and Final Exhibit Lists as contained in their respective Pretrial Memorandum previously filed with this [c]ourt."

### *Vacation of the November 2023 trial*

- When it became clear the trial stacked first on the November 6, 2023, date would be tried, the court reset the trial date for July 15, 2024.

- On May 15, 2024, the Hunters moved to supplement the testimony of their medical expert to reflect LH's recent medical treatment.  The Hunters also sought to add additional exhibits including a storyboard.  The School District objected.  The court denied both of the Hunters' requests.

### *Trial*

- The jury trial began on July 15, 2024.  The substance of the trial proceedings will be discussed further below.  But for context, after a somewhat contentious voir dire, the Hunters' counsel began his opening statement.  After numerous objections and sidebars during the attempted opening statement, the School District moved for a mistrial arguing that the opening statement was inappropriate and argumentative.  The district court granted the mistrial.  The court further stated that it would consider a request to dismiss the case based on the conduct of the Hunters' counsel during the lengthy course of the case.

- The School District filed a motion to dismiss on July 29, 2024; the Hunters replied on August 12, 2024.

- On August 28, 2024, the district court dismissed all the remaining claims with prejudice to sanction the Hunters' counsel.  The district court's reasoning on dismissal will be discussed below.

[¶8]    The Hunters timely appeal, challenging the district court's expert witness rulings, summary judgment rulings, and dismissal with prejudice.

### ISSUE 1

[¶9]    Did the district court err when it excluded several of the Hunters' experts?

## STANDARD OF REVIEW

[¶10]   Wyoming Rule of Evidence 702 allows witnesses to provide expert opinions if the expert and her testimony meet certain criteria. W.R.E. 702.   We give considerable deference to district courts when determining the expert testimony that should and should not be considered. *BNSF Ry. Co. v. Box Creek Min. Ltd. P'ship*, 2018 WY 67, ¶ 23, 420 P.3d 161, 167 (Wyo. 2018) (citing *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (*Goebel I* ); accord *Easum v. Miller*, 2004 WY 73, ¶ 21, 92 P.3d 794, 800 (Wyo. 2004); and *Bunting v. Jamieson*, 984 P.2d 467, 470 (Wyo. 1999)). When deciding the admissibility of expert testimony, we have adopted the federal *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), standard. *Bunting*, 984 P.2d at 471.   The district court "has discretion in the *manner* in which it conducts its *Daubert* analysis[.]" *BNSF Ry. Co.*, ¶ 24, 420 P.3d at 167 (quoting *Goebel I*, 215 F.3d at 1087).   However, "there is no discretion regarding the actual *performance* of the gatekeeper function." *Id.*   Accordingly, we review the question of whether the district court performed its gatekeeper role and applied the proper legal standard in admitting or excluding an expert's testimony de novo. *Id.* at ¶ 25, 420 P.3d at 167 (quoting *Easum*, ¶ 21, 92 P.3d at 800).

[¶11]   This Court, like Federal courts, recognizes "that the district court need not recite the *Daubert* standard as though it were some magical incantation, or apply all of the reliability factors suggested in *Daubert* and *Kumho [Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)]." *BNSF Ry. Co.*, ¶ 26, 420 P.3d at 167.   The gatekeeper inquiry under Rule 702 is ultimately a flexible determination. *Id.* (citing *Goebel I*, 215 F.3d at 1088).   Even so, the district court "must provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function." *Id.* (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017)).

## DISCUSSION

[¶12]   The "gatekeeper" function imposed by W.R.E. Rule 702 is to test the reliability and relevancy of proposed expert testimony. *Hoy v. DRM, Inc.,* 2005 WY 76, ¶ 13, 114 P.3d 1268, 1276 (Wyo. 2005) (citing *Kumho Tire Co.,* 526 U.S. at 141, 119 S. Ct. at 1171; *Daubert,* 509 U.S. at 592–93, 113 S. Ct. at 2796–97).   The primary goal of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Reichert v. Phipps,* 2004 WY 7, ¶ 7, 84 P.3d 353, 356 (Wyo. 2004) (citing *Bunting*, 984 P.2d at 471).   The *Daubert* analysis is a two-part test. *Hoy,* ¶ 13, 114 P.3d at 1277.   "[F]irst, the trial court is to determine whether the methodology or technique used by the expert is reliable, and second, the trial court must determine whether the proposed testimony "fits" the particular case." *Id*. (citing *Bunting,* 984 P.2d at 471).

6

[¶13] We have noted our approval of the following non-exclusive list of criteria that can be utilized to guide district courts in making the first determination:

> 1) whether the theory or technique in question can be and has been tested; 2) whether it has been subjected to peer review and publication; 3) its known or potential rate of error along with the existence and maintenance of standards controlling the technique's operation; 4) the degree of acceptance within the relevant scientific community; 5) the extensive experience and specialized expertise of the expert; 6) whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation; and 7) the non-judicial uses to which the method has been put.

*Id.* (citing *Bunting*, 984 P.2d at 472) (citation modified).

[¶14] The second part of *Daubert's* two-part test regarding the "fit" of the expert testimony is a question of relevance that incorporates the concept of "helpfulness" found in W.R.E. 702. *Id.* The expert's opinion must pertain to an issue that is in dispute in the case and must provide "a valid scientific connection to the pertinent inquiry." *Id.* (citing *Bunting,* 984 P.2d at 472).

[¶15] The Hunters assert the district court "improperly applied the *Daubert* test to exclude [their] experts" and claim the district court erroneously excluded five of their experts based on a misunderstanding of the *Daubert* test. Because they devoted most of their brief to the dismissal issue, the Hunters' analysis on the *Daubert* issue is abbreviated and cannot be described as robust. Indeed, the Hunters only discuss four of the five proposed expert witnesses and do so only briefly. They do not set forth or discuss the *Daubert* standard or how they believe the district court misunderstood the standard. The lack of substantial argument makes it appear as if the Hunters have almost abandoned their *Daubert* arguments on appeal.

[¶16] Nevertheless, because we review de novo whether the district court has **performed** its gatekeeping function, we will briefly discuss the district court's *Daubert* ruling. The district court's order demonstrates the district court understood the *Daubert* standard and the criteria it could use to determine whether the methodology or technique used by the expert was reliable. The district court discussed the correct standard as set forth in *Bunting,* the two-part test, and the criteria it could consider in making its determinations. The district court analyzed each expert's report and the evidence developed during discovery using the appropriate criteria. The court analyzed each expert's proposed testimony in the context of this particular case. The court excluded the four experts in question for different reasons

7

finding the proposed expert opinions were either offered by individuals not qualified to offer the opinion, not reliable, or did not fit the facts of this case and thus would not be helpful to the jury. We conclude the district court adequately performed its gatekeeping function and provided "more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function." *BNSF Ry. Co.*, 2018 WY 67, ¶ 26, 420 P.3d at 167.

[¶17] Given the brevity of their argument, the Hunters have not presented a sufficient analysis of how the district court abused its discretion by excluding the expert testimony. As explained in the standard of review, we give considerable deference to district courts determining the expert testimony that should and should not be considered. *BNSF Ry. Co.*, ¶ 23, 420 P.3d at 167. Judicial discretion is a combination of many things, including conclusions drawn from objective criteria; "it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Corley v. Wyo. Rents, LLC*, 2024 WY 51, ¶ 26, 547 P.3d 333, 338 (Wyo. 2024) (citing *Dollarhide v. Bancroft (Dollarhide II)*, 2010 WY 126, ¶ 4, 239 P.3d 1168, 1170 (Wyo. 2010)). After reviewing the district court's order, and without the benefit of a robust analysis from the Hunters, we cannot conclude the district court's ruling exceeds the bounds of reason under the circumstances or that the court could not have reasonably concluded as it did. Thus, we also find no abuse of discretion.

## ISSUE 2

[¶18] Did the district court err when it granted summary judgment?

## STANDARD OF REVIEW

[¶19] Summary judgment is appropriate when no genuine issue of material fact exists and the prevailing party is entitled to judgment as a matter of law. *Chesapeake Expl.*, LLC v. Morton Prod. Co., LLC, 2025 WY 15, ¶ 29, 562 P.3d 1286, 1295 (citing *Comet Energy Servs., LLC v. Powder River Oil & Gas Ventures, LLC*, 2008 WY 69, ¶ 5, 185 P.3d 1259, 1261 (Wyo. 2008)); *see also* W.R.C.P. 56(c). This court reviews summary judgment decisions de novo, using the same materials and standards as the district court and gives no deference to the district court's conclusions. *Groff v. McKellar Tiedeken & Scoggin, LLC*, 2025 WY 54, ¶ 14, 568 P.3d 1164, 1167 (Wyo. 2025) (citing *Sorensen v. Halling*, 2025 WY 8, ¶ 6, 561 P.3d 1241, 1244 (Wyo. 2025)). "A district court may grant summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Weir v. Expert Training, LLC*, 2022 WY 44, ¶ 15, 507 P.3d 442, 447 (Wyo. 2022) (quoting W.R.C.P. 56(c) (2016)).

## DISCUSSION

8

[¶20] Wyoming Rule of Civil Procedure 56 governs summary judgment and imposes obligations on both the movant and the nonmovant. *See Chesapeake Expl.*, 2025 WY 15, ¶ 29, 562 P.3d at 1295; *Kaufman v. Rural Health Dev., Inc.*, 2019 WY 62, ¶ 14, 442 P.3d 303, 307 (Wyo. 2019). If the moving party has made a prima facie case showing that there is no genuine issue of material fact, the burden shifts to the party opposing the motion to present evidence showing that a genuine issue of material fact exists. *Little Med. Creek Ranch, Inc. v. D'Elia*, 2019 WY 103, ¶ 14, 450 P.3d 222, 228 (Wyo. 2019) (citing *Mantle v. N. Star Energy & Constr. LLC*, 2019 WY 29, ¶ 110, 437 P.3d 758, 795 (Wyo. 2019)). "Materiality of a fact depends upon it having some legal significance so that it establishes or refutes some essential element of a cause of action or defense asserted by one of the parties." *Id.* at ¶ 16, 450 P.3d at 228 (quoting *Braunstein v. Robinson Family Ltd. P'ship LLP*, 2010 WY 26, ¶ 16, 226 P.3d 826, 833 (Wyo. 2010)).

[¶21] To defeat a motion for summary judgment, the opposing party must present competent evidence which would be admissible at trial. *Leonhardt v. Big Horn Cnty. Sheriff's Off.*, 2024 WY 128, ¶¶ 16–17, 559 P.3d 1053, 1058–59 (Wyo. 2024). "The party opposing the motion must present specific facts; relying on conclusory statements or mere opinion will not satisfy that burden, nor will relying solely upon allegations and pleadings." *Little Med. Creek Ranch*, ¶ 14, 450 P.3d at 228 (citing *Boehm v. Cody Country Chamber of Com.*, 748 P.2d 704, 710 (Wyo. 1987)). "However, the facts presented are considered from the vantage point most favorable to the party opposing the motion, and that party is given the benefit of all favorable inferences that may fairly be drawn from the record." *Id.* (citation omitted).

[¶22] We begin our discussion with the Business Defendants' prima facie showing no genuine issue of material fact existed, and they were entitled to judgment as a matter of law. The Hunters asserted various theories of product liability. Although presented in a variety of forms, at their core, the Hunters' theories of product liability were: strict product liability, breach of warranty, and negligent product liability. As the district court recognized, one element common to every products liability case is the requirement that the plaintiff show a defect whether the case is brought "on a theory of negligence, breach of an express or implied warranty, strict tort liability, or a combination of theories." *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 64 (Wyo. 1989) (quoting W. Kimble & R. Lesher, Products Liability § 53 at 69 (1979)).

[¶23] This Court has described a "defective product" as one which is "not reasonably safe" or is "unreasonably dangerous" to the user or consumer. *Rohde v. Smiths Med.*, 2007 WY 134, ¶ 18, 165 P.3d 433, 437 (Wyo. 2007) (citing *Campbell v. Studer, Inc.,* 970 P.2d 389, 392 (Wyo. 1998)). A product is "not reasonably safe" for the user when the "foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design [] and the omission of the alternative design renders the product not reasonably safe." *Loredo v. Solvay Am., Inc.*, 2009 WY 93, ¶ 20, 212 P.3d 614,

630 (Wyo. 2009) (citation omitted) (citation modified). "[I]f a product is safe for normal handling and consumption, it is not defective." *Rohde,* ¶ 18, 165 P.3d at 437 (citing *Campbell,* 970 P.2d at 392 (Wyo. 1998)).

[¶24] When trying to show a product is defective, it is not enough for the plaintiff to show an injury occurred during use of the product. *Id.* "Instead, a plaintiff must show a defect in the product, which he may do either by presenting evidence of a specific defect or by inference." *Id.* (citation omitted). A defect can be inferred "if a prima facie case can be presented that there was no abnormal use of the product or that there were no reasonable secondary causes for the defect." *Id.* at ¶ 19, 165 P.3d at 438. A party cannot rely on conclusory statements a product was defective nor can conclusory statements be employed in disposing of a motion for summary judgment. *Campbell*, 970 P.2d at 394.

[¶25] Accordingly, to be entitled to summary judgment on the Hunters' product liability claims, the Business Defendants had the initial burden to establish a prima facie case that the Hunters could not satisfy the elements of their claims. They endeavored to do so by presenting facts to show that Rocks and Ropes was not unreasonably dangerous and, therefore, not defective. They relied primarily on the affidavits of Daniel Christensen and Teresa Hendy. Mr. Christensen is one of the founders of UPC and also a Playground Safety Inspector, certified by the National Certification Board of the National Recreation and Park Association. Among other qualifications, Teresa Hendy is the Vice-Chair of the American Society for Testing and Materials (ASTM) committee that developed the applicable safety standard, ASTM F1487. Both testified that ASTM F187 is the playground industry standard of care and that Rocks and Ropes is certified under that and other safety standards.

[¶26] Mr. Christensen designed Rocks and Ropes with Jay Beckwith. They relied on their experiences, knowledge of the use of rope bridges in playground equipment, and observations of children playing on similar playground equipment to design Rocks and Ropes. It was designed to have multiple children play on it simultaneously. Mr. Christensen testified that the Consumer Product Safety Commission (CPSC) recognizes equipment such as Rocks and Ropes can be used by children ages 5-12.

[¶27] Ms. Hendy has over thirty years of experience designing playgrounds and as a playground safety consultant. Ms. Hendy had familiarity with the history of this type of equipment and explained that it has been around since the 1980s and has a history of use. She indicated the ropes in this sort of design were tested with the maximum number of users based on the ASTM recommendations for loading. The recommendations included a margin of safety, thus there is no need to specify the number of users that may use Rocks and Ropes at one time. Ms. Hendy also recognized that the installation instructions for Rocks and Ropes indicate the amount of slack that should be allowed in the ropes.

[¶28] Ms. Hendy opined that Rocks and Ropes was safe for use by elementary-aged children and did not require additional operating instructions or warnings regarding

10

supervision. She expressed her view there were no hidden dangers that would surprise LH and even a five-year-old can understand how to use Rocks and Ropes. Her ultimate opinion was Rocks and Ropes was not defective, was not unreasonably dangerous, and had appropriate installation instructions and warnings.

[¶29] Together Mr. Christensen's and Ms. Hendy's affidavits established a prima facie case that Rocks and Ropes was not defective and had adequate warnings. These individuals have significant experience in the playground industry and are highly familiar with the safety requirements needed for playground equipment. Together their testimony established that the Rocks and Ropes design is not new, has been tested for safety, and has been certified by the primary safety organizations in the industry. While meeting the applicable safety guidelines does not necessarily mean a product is not defective, it is an important consideration especially in terms of whether there is a reasonable alternative design which is a factor in determining whether a product is defective. *See Loredo,* ¶ 20, 212 P.3d at 630; *Campbell*, 970 P.2d at 390–93 (discussing reasonable alternative design). In this instance, it contributed to the Business Defendants' showing that there was not a reasonable alternative design and thus not a defect.

[¶30] Mr. Christensen's and Ms. Hendy's sworn testimony met the Business Defendants' burden to show the Hunters failed to establish a genuine issue of material fact about an essential element of their product liability case—that Rocks and Ropes was defective when sold. It was therefore proper for the district court to find, and we agree, that the burden shifted to the Hunters to show a genuine issue of material fact existed.

[¶31] Unfortunately for the Hunters, much of the decision on summary judgment hinges on the rulings related to the experts. Because we affirmed the district courts' exclusion of the Hunters' experts, we must affirm the district court's grant of summary judgment. Without the experts or other admissible evidence, the Hunters cannot rebut the Business Defendants' prima facie case.

[¶32] We observe initially the Hunters' response to the motions for summary judgment was lacking. As the district court noted, the response was essentially a two-page conclusory argument that did not cite to specific records or documents, except a general reference to an exhibit. Between their response and Rule 56.1 statement of undisputed facts, the Hunters attached over 1000 pages of exhibits. While the Rule 56.1 statement contained some citations to the record, those citations cannot be described as pinpoint as some were to the entirety of lengthy exhibits and attachments. Without pinpoint citations or a substantive argument, the district court, and subsequently this Court, was left to sift through hundreds of pages of documents, many of which were irrelevant to the issues raised by the summary judgment motions, searching for the facts the Hunters claimed were in dispute.

[¶33] Through the sifting and construing of the Hunters' response in the best light possible, as the district court did, it appears the Hunters were asserting there were genuine issues of material fact for two primary reasons. First, they asserted the ropes used in Rocks and Ropes are defective because they did not have enough tension. Second, the Hunters asserted Rocks and Ropes is challenge course equipment, not playground equipment, and challenge courses have different safety standards than playground equipment.

[¶34] In making these arguments, the Hunters relied on the depositions and reports of their proposed expert witnesses. But as noted above, the district court properly excluded those experts. To rebut a prima facie case on summary judgment, the opposing party must present competent evidence which would be admissible at trial. *Leonhardt*, 2024 WY 128, ¶¶ 16–17, 559 P.3d at 1058–59; *Ramirez v. Brown*, 2020 WY 79, ¶ 14, 466 P.3d 285, 289 (Wyo. 2020). The evidence the Hunters rely on was not admissible at trial.[2] As noted in our discussion of the expert witnesses above, the Hunters' proposed expert witnesses' opinions were deemed too unreliable, speculative, or did not fit the facts of this case.

[¶35] More importantly, they did not show a product defect. Even if we were to consider the testimony of the proposed experts as the district court did, none of the experts presented reliable testimony that explained how Rocks and Ropes was unreasonably dangerous which is required to show a product defect. None of the experts disputed the evidence that Rocks and Ropes met industry standards, that this type of design had been used for decades by manufacturers, and that the installation instructions and warning were adequate. Without other evidence or substantial analysis or argument in their response to the motions for summary judgment, the Hunters failed to meet their burden to rebut the Business Defendants' prima facie case.

[¶36] On appeal, the Hunters assert that under Wyoming law even if they could not present evidence of a specific defect, they could still rely on the inference of a defect theory citing *Sims v. Gen. Motors Corp.*, 751 P.2d 357, 360 (Wyo. 1988). A plaintiff is entitled to an inference that a product was defective at the time it left the seller's hands if a prima facie case can be presented that "there was no abnormal use of the product or that there were no reasonable secondary causes for the defect." *Id.* If the Hunters could have made that prima facie showing, they may have been entitled to the inference. However, the inference is not allowed simply because the product failed or there was an injury. *Id.* The party seeking the inference has the additional burden to present evidence there was no abnormal use and no reasonable secondary causes of the defect or injury. *Id.*

[¶37] The Hunters did not show there was no abnormal use or misuse of Rocks and Ropes. This is likely in part because they did not focus on the inference of defect theory in the

---

[2] Although the district court excluded the relevant experts, its summary judgment orders discussed the proposed expert testimony and fully analyzed the proposed testimony in the context of whether the Hunters had rebutted the presumption the Business Defendants were entitled to judgment on the Hunters' claims.

district court. Regardless, the record simply does not support a showing of the necessary factors entitling the Hunters to the inference of a defect.

[¶38] The Hunters also argue the district court made its summary judgment rulings failing to account for their theory Rocks and Ropes was a challenge course not playground equipment, and therefore a different industry standard applied than the one the Business Defendants' experts testified as applicable to Rocks and Ropes. The district court recognized the Hunters' claim and rejected it, finding the Hunters' proposed experts could not specify a challenge course standard that required a different specific rope tension. Again, the Hunters rely on excluded expert testimony. Even if we were to consider it as the district court did, in our review of the record, we agree the Hunters did not present admissible evidence to show a genuine issue of material fact under either the playground standard or challenge course standard.

[¶39] In summary, once the Business Defendants provided evidence and testimony to show Rocks and Ropes was not defective, the burden shifted to the Hunters to identify disputed facts based on evidence in the record to show Rocks and Ropes was unreasonably dangerous whether it was by design, manufacture, or warning. *Little Med. Creek Ranch,* 2019 WY 103, ¶ 14, 450 P.3d at 228 (citing *Mantle*, 2019 WY 29, ¶ 110, 437 P.3d at 795). They did not meet this burden because they relied on their own conclusory and categorical statements and their experts' opinions. *Campbell*, 970 P.2d at 394. The district court properly excluded those experts as unreliable and not fit for this case. The Hunters did not meet their burden on any of their product liability claims because they did not show a defect.

[¶40] Regarding their negligence and failure to warn theories, embedded in their strict products liability cause of action, the Hunters seemed to allege the Business Defendants negligently designed, manufactured, distributed, and sold Rocks and Ropes and failed to warn about the dangers associated with the equipment. On appeal, the Hunters appear to claim the Business Defendants did not present arguments on the negligence claims and the district court failed to address their negligence claims on summary judgment. This is not accurate. The Business Defendants included these claims in their motions for summary judgment, and the court addressed the claims. The district court found the Hunters did not offer any admissible evidence there had been a breach of a duty or evidence a breach of duty had caused LH's injuries. In our review, we also could not find any admissible evidence.

[¶41] We therefore conclude the district court did not err in granting summary judgment.

## *ISSUE 3*

[¶42] Did the district court abuse its discretion when it dismissed the Hunters' case with prejudice?

13

**STANDARD OF REVIEW**

[¶43] District courts have the discretion to supervise court proceedings and impose sanctions when parties violate their orders. *Corley*, 2024 WY 51, ¶ 25, 547 P.3d at 338 (citing *Nw. Bldg. Co., LLC v. Nw. Distrib. Co., Inc.*, 2012 WY 113, ¶ 18, 285 P.3d 239, 243 (Wyo. 2012)). We review district court sanction decisions for an abuse of discretion. *Id*. Judicial discretion is a combination of many things, including conclusions drawn from objective criteria; "it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Id*. at ¶ 26 (citing *Dollarhide II*, 2010 WY 126, ¶ 4, 239 P.3d at 1170). "A court abuses its discretion when it acts in a manner which exceeds the bounds of reason under the circumstances." *Id*. The core of our inquiry is the reasonableness of the choice made by the trial court. *Dewey v. Dewey*, 2001 WY 107, ¶ 18, 33 P.3d 1143, 1148 (Wyo. 2001).

**DISCUSSION**

[¶44] We have described the dismissal of an action as "the most severe of penalties, which ought to be assessed only in the most extreme situations." *Dollarhide v. Bancroft (Dollarhide I)*, ¶ 11, 193 P.3d 223, 226 (Wyo. 2008) (quoting *Glatter v. Am. Nat'l Bank of Powell*, 675 P.2d 642, 644 (Wyo. 1984)). We have further explained that Wyoming courts should generally avoid dismissal because it "has always been the policy of our law to resolve doubts in favor of permitting parties to have their day in court on the merits of a controversy." *Corley,* ¶ 27, 547 P.3d at 338 (quoting *Waldrop v. Weaver*, 702 P.2d 1291, 1294 (Wyo. 1985)). When considering whether the "severe sanction of dismissal is justified," we examine the circumstances surrounding the case, "keeping in mind the conflict between the need for the court to manage its docket for the purpose of preventing undue delay on the one hand, and the policy favoring disposition of cases on the merits on the other hand." *Corley*, ¶ 28, 547 P.3d at 339 (quoting *Nw. Bldg. Co.,* ¶ 21, 285 P.3d at 244). The district court "should not go beyond the necessities of the situation to foreclose trial on the merits merely as punishment for general misbehavior." *Waldrop*, 702 P.2d at 1293 (citing *Dorsey v. Acad. Moving & Storage, Inc.,* 423 F.2d 858 (5th Cir.1970)). "Because the 'extreme situations' in which dismissals occur are rare, no precise rule can be set forth to specify what circumstances truly justify such sanction." *Corley*, ¶ 28, 547 P.3d at 339 (citing *Dollarhide I*, ¶ 11, 193 P.3d at 226).

[¶45] In *Dollarhide II*, when discussing the inherent authority of courts to enter sanctions including dismissal, we stated many other courts had recognized courts possess the inherent authority to craft sanctions for severe litigation abuse. 2010 WY 126, ¶ 21, 239 P.3d at 1175 (citing *Campos v. Corr. Officer Smith,* 418 F. Supp. 2d 277, 279 (W.D.N.Y. 2006) (complaint dismissed where plaintiff knowingly presented a falsified exhibit); *Vargas v. Peltz,* 901 F. Supp. 1572, 1579 (S.D. Fla. 1995) (complaint dismissed where plaintiff fabricated evidence and committed perjury); *Sun World, Inc. v. Lizarazu Olivarria,* 144

14

F.R.D. 384, 389 (E.D. Cal. 1992) (default entered against defendants who submitted fraudulent documents and committed perjury); *Aoude,* 892 F.2d at 1118 (claim dismissed where plaintiff attached a "bogus" agreement to the complaint); *Eppes v. Snowden,* 656 F. Supp. 1267, 1279 (E.D. Ky. 1986) (answer and counterclaim stricken because defendant submitted backdated documents). Courts have "far-reaching power to control their business and proceedings and to enforce their orders and process in conducting the business of a court." *Id.* at ¶ 22 (quoting *Bi–Rite Package, Inc. v. Dist. Court of the Ninth Judicial Dist.,* 735 P.2d 709, 712 (Wyo. 1987)). "Needless to say, of course, is the fact that possession of the inherent authority to do something does not equate to the requirement that such be done." *Id.* at ¶ 23.

[¶46] In this instance, the district court cited W.R.C.P. 37(b)(2), W.R.C.P. 41(b), and U.R.D.C. 901 as authority to order dismissal for counsel's conduct. Rule 37(b) allows dismissal as a sanction for failure to follow discovery orders and rules. W.R.C.P. 37((b)(2)(A)(v). Rule 41(b) allows dismissal for a failure to prosecute the case, comply with the rules of civil procedure, or comply with court orders. W.R.C.P. 41(b)(1). Rule 901 allows dismissal for violations of the uniform rules for district courts. U.R.D.C. 901. The court did not mention its inherent authority.

[¶47] The district court's order of dismissal followed a mistrial and was based, in part, on the mistrial. Thus, to understand the court's dismissal order, it is helpful to understand the events that precipitated the mistrial.

[¶48] The problems started early during voir dire. The Hunters' counsel repeated inappropriate questions even after he had been directed to move on by the district court and presented what could be considered specific argument about the case. Some of the problematic questions asked by the Hunters' counsel include: 1) asking potential jurors whether and why it is important to have safety rules for supervising children; 2) congratulating and thanking a potential juror for agreeing that properly supervised dangerous activities can be done safely; 3) asking potential jurors about their expectations for the level of supervision at a school; 4) asking potential jurors if they could supervise fifty 11-year-old children; 5) explaining the Hunters' specific contentions—improperly trained playground supervisors and lack of supervision—and asked if the potential jurors could take those facts into account.

[¶49] More problematically, the Hunters' counsel also asked whether it was "fair for the [S]chool [D]istrict to take advantage of the fact they didn't have a supervisor in place as a defense that it – something didn't happen because they didn't see it happen?" The School District objected to the question and the court sustained the objection. The Hunters' counsel then asked, "what kind of supervision would you expect in a grade school for low ropes[?]" The School District objected to the question and the court sustained the objection and explained to the Hunters' counsel that he was "trying to condition the jurors as to the facts of this particular case[.]"

15

[¶50] The Hunters' counsel asked questions about the bias of jurors, which is appropriate, however, he asked those questions repeatedly, even after they had already been asked and answered. After the question was asked repeatedly, the School District objected. The court sustained the objection and directed the Hunters' counsel to move on. The Hunters' counsel attempted to continue with the question, and the district court again told counsel to move on.

[¶51] We agree with the district court's assessment that most of the voir dire was an improper attempt to argue the Hunters' contentions and precondition jurors to the Hunters' position. The only purpose of voir dire is to select jurors "who will fairly and impartially hear the evidence and render a just verdict." W.R.C.P. 47(c)(1). Counsel's conduct appeared to be arguing his clients claims and inappropriately attempting to precondition the jury to believe it needed to either punish or send a message to the School District, both violations of W.R.C.P. 47. *See* W.R.C.P. 47(c)(2), 47(c)(3)(C), and 47(c)(3)(D).

[¶52] The proceedings then moved to opening statements where things did not improve. Early in his opening statement, the Hunters' counsel stated, "[t]hese safety rules, like all safety rules, protect us and our children only if jurors have the courage to enforce them." The School District objected, the Court sustained the objection and directed the Hunters' counsel to just present the facts of the case.

[¶53] The Hunters' counsel then tried to describe the alleged safety rules a school district must follow and asked to use storyboard to do so. However, the court had previously ruled that the storyboard could not be used without the approval of the School District's counsel. Opposing counsel had not approved the use of the board, so the court did not allow its use. Immediately, the Hunters' counsel stated to the jury, "so I would put it on a board and what it would say . . ." and stated the safety rules "come from state and federal law and standards." The School District again objected on the basis the statements were argumentative. The district court held a sidebar. The district court overruled the objection but ordered counsel to keep the opening statement to the facts of the case.

[¶54] Shortly after this sidebar, the Hunter's counsel stated, "If it wasn't [LH] hurt that day, it could have been any one of the other 250 kids at recess at the same time that day." The School district objected, and the court sustained the objection directing the Hunters' counsel to move on. The Hunters' counsel then stated, "All right. And playground equipment isn't the only place where failing to supervise at school is dangerous. The school district must supervise who is allowed to enter the school building, the equipment and computers the school provides students for use in school, the teachers they hire[.]" Another objection and sidebar ensued.

[¶55] The School District asserted the statements violated the court's motion in limine about presenting "other bad acts" or responsibilities. The court sustained the objection,

16

explaining that counsel's statement was argumentative, irrelevant, and inflamed the passions of the jury. The court again instructed counsel to simply present the facts of the case and not make argument.

[¶56] Immediately thereafter, Hunters' counsel continued his opening and stated part of his job was to help the jury determine, "for the community, whether the safety rules were broken." The School District again objected on the same basis. The district court sustained the objection and asked the Hunters' counsel to abide by its rulings. The Hunters' counsel responded, "I am." The district court then held another sidebar. The discussion centered around inflaming the passion of the jury. At the end of the side bar, the court stated:

> So, Mr. [Hunter's Counsel], you're talking about the case in its entirety. You're not talking about opening statements. We're making an opening statement. It's a very simple process. It has a very simple purpose, and that is to explain the basic evidence and what you intend to show. And I believe that you are violating my orders. You're violating orders I just gave you, which is not to try to inflame the passions of the jury, and that's exactly what you're doing.
>
> So this is what I'm going to say: You do that again, I'm going to hold you in contempt. You understand?

[¶57] The Hunters' counsel said he understood but he thought the court was being very unfair. Shortly after, the Hunters' counsel resumed his opening statement, and the following exchange took place:

> [THE HUNTERS' COUNSEL]: This playground equipment is not only used by Meadowlark Elementary kids while school is in session and staff and teachers are supervising. Kids from all over this community can use this playground equipment in the evenings, weekends, and all summer long.
>
> [THE SCHOOL DISTRICT'S COUNSEL]: Objection.
>
> THE COURT: Sustained.
>
> [THE SCHOOL DISTRICT'S COUNSEL]: He just violated your [c]ourt order.
>
> THE COURT: Please take the jury out.
>
> THE COURT: Sit down, Mr. [the Hunters' counsel]. I'll try to

be measured, Mr. [the Hunters' counsel]. I don't know what you're up to. I don't know whether you're trying to get a mistrial. I don't know what you're doing, but you have flagrantly ignored what I've told you not to do. I've asked you to make an opening statement, and what you're making is a closing argument.

You're routinely playing to the passions of the jury and suggesting that somehow this case is so important because someone else might be injured. You're violating the [c]ourt's orders. And you're doing it, even though I just told you not to.

What's going on, Mr. [the Hunters' Counsel]? What's your explanation?

[THE HUNTERS' COUNSEL]: My explanation is that this is a very reasonable opening statement. It is presenting the evidence to the jury. The [c]ourt is interfering and preventing me from presenting the evidence to the jury and telling the jury what we're going to prove at trial.

THE COURT: So opening statement is not presenting evidence to the jury. Witnesses present evidence to the jury. I instructed the jury that what attorneys say is not evidence. And so you're wrong, Mr. [the Hunter's counsel]. This is not presenting evidence to the jury. This is arguing to the jury in your opening statement, and I've asked you not to do it, and you've continued to do it.

[THE HUNTERS' COUNSEL]: Your Honor, I am stating the evidence that we're going to prove at trial. You know that's what I meant. That's what I mean, is that we're presenting the evidence. We're telling the jury what the evidence is we're to go present at trial. We have the burden of proof to show that this act -- this event was foreseeable. It was foreseeable in a variety of different ways.

THE COURT: And no one disagrees you have the burden of proof. And no one disagrees that's what the law is. But this is an opening statement. Make an opening statement, present your evidence, and then make your closing argument. Understood?

18

[THE HUNTERS' COUNSEL]: I -- Your Honor, I don't understand, because I've never had any situation like this before with any judge in 46 years of practicing law. I've never had this kind of problem.

THE COURT: Well, I'm sorry that you haven't had that experience with another judge, but you're in this courtroom, with this judge, and I've asked you not to do something and you continue to do it. Did you do that with other judges?

[THE HUNTERS' COUNSEL]: I didn't have any judge ever talk to me this way about presenting evidence -- the summary of evidence at trial. I think it's extraordinarily inappropriate for the [c]ourt to do this.

[¶58] Thereafter, the School District's counsel made a record of his objection focusing on the Hunters' counsel refusing to abide by the rules of the court, his attempt to inflame the passions of the jury, and arguing there was responsibility to protect the community. He then moved for a mistrial. The court allowed the Hunters' counsel to respond and then stated counsel should not make arguments about the law but instead present the evidence the jury would hear. He stated he would give the Hunters' counsel one more chance to present an appropriate opening statement laying out the evidence the jury would hear.

[¶59] The Hunters' counsel began again. After the School District objected to another portion of the opening as argumentative and the court sustained the objection, the Hunters' counsel said the School District would argue no one saw the incident happen so it didn't occur and the School District was accusing LH "of not telling the truth." Again, the School District objected and moved for a mistrial. After a discussion, which included whether the Hunters' counsel was acting in good faith and the district court determining that he was not, the district court granted the mistrial.

[¶60] We agree that a mistrial was appropriate in these circumstances. As noted above, the Hunters' counsel violated the rules governing voir dire. Additionally, we agree with the district court's assessment the attempted opening statement was inappropriate because it attempted to impassion the jury and violated the district court's rulings and orders.

[¶61] We have stated that "[a]n opening statement has a narrow purpose and scope." *Whitney v. State*, 2004 WY 118, ¶ 86, 99 P.3d 457, 485–86 (Wyo. 2004) (citing *Hopkinson v. State*, 632 P.2d 79, 112 (Wyo. 1981)). The purpose is to outline the evidence that will be presented to make it easier for the jurors to understand what will follow. *Id*. Opening statements are not an occasion for argument or to try to influence the jury to reach a verdict based on statements not susceptible to proof. *Id*.

[¶62] Furthermore, it is entirely inappropriate for an attorney to make statements intended to appeal to the jury's prejudice or passion, especially encouraging a jury to rule to protect the community. *Burton v. State*, 2002 WY 71, ¶ 15, 46 P.3d 309, 314 (Wyo. 2002). These types of arguments, known as golden rule arguments, are widely recognized as improper. *Buszkiewic v. State*, 2018 WY 100, ¶ 13, 424 P.3d 1272, 1277 (Wyo. 2018). Golden rule arguments are jury arguments that ask "jurors to reach a verdict by imagining themselves or someone they care about in the place of the injured plaintiff or crime victim." *Id.* (quoting *Brown v. State,* 2014 WY 104, ¶ 18 n.5, 332 P.3d 1168, 1174 n.5 (Wyo. 2014)); s*ee also* 75A Am. Jur. *Trial* § 547 (2018). Golden rule arguments are "impermissible because it encourages the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Id.* (quoting 75A Am. Jur. *Trial* § 547 ).

[¶63] Jury verdicts are to be based on the evidence presented at trial, not emotion or some other policy consideration. *Id*. at ¶ 15; s*ee also Caudle v. D.C.,* 707 F.3d 354, 360 (D.C. Cir. 2013); *Puckett v. State*, 918 S.W.2d 707, 711 (Ark. 1996). Attorneys are not to arouse the passions and prejudices of the jurors against societal evils. *Hill v. State*, 2016 WY 27, ¶ 45, 371 P.3d 553, 565 (Wyo. 2016) (citing *Hernandez v. State*, 2010 WY 33, ¶ 23, 227 P.3d 315, 322–23 (Wyo. 2010)). It is improper to seek a verdict for the purpose of protecting the community rather than based on the evidence presented at trial. *Id*.

[¶64] Accordingly, at least segments of the Hunters' counsel's voir dire and opening statement were inappropriate, and we will not second-guess the court's on-site, real-time assessment of the impact of improper statements to the jury. *Boline v. JKC Trucking and Syrzyna*, 2025 WY 27, ¶ 37, 565 P.3d 669, 678 (Wyo. 2025). We, therefore, hold that the district court did not abuse its discretion in granting the mistrial.

[¶65] We arrive, finally, at the district court's order of dismissal. The infractions the district court cited to support the dismissal were: 1) failing to prosecute the case in a timely manner; 2) violating various rules of civil procedure, including not filing an expert witness designation until three years after it was due citing W.R.C.P. 26(a)(2)(A) and 26(a)(3)(A), failing to file a short and concise statement of material fact with pinpoint citations to specific portions of the record and materials relied on in support of the parties' position as required by Rule 56.1, and attaching hundreds of pages of exhibits that were not all admissible in violation of Rule 56(c)(2); 3) violating Rule 47(c) related to voir dire; 4) repeatedly violating and ignoring the court's orders throughout the case, including during opening statements; and 5) violating U.R.D.C. 801(b) related to civility. We take the infractions one at a time.

[¶66] First, we consider the district court's assessment the Hunters failed to prosecute the case in a timely manner. The law places the "duty of expediting the case" chiefly with the plaintiff. *Corley,* ¶ 30, 547 P.3d at 339 (citing *Dollarhide I*, ¶ 15, 193 P.3d at 227). This case did indeed take an inordinate amount of time. As outlined in the fact section, there

20

were numerous requests for extensions and rescheduling. However, as also detailed in the fact section, not all of those extensions were attributable to the Hunters. The motions that were filed by the Hunters were often unopposed and granted without comment. Frequently, the Hunters objected to moving the trial date. This case is not like those that demonstrate undue delay because of inattention to a claim or an action that lies completely dormant for extended periods of time. *Johnson v. Bd. of Comm'rs of Laramie Cnty.,* 588 P.2d 237, 238 (Wyo. 1978). Additionally, while not an excuse, but certainly having some impact on everyone involved, the early proceedings of this case took place during the height of the COVID-19 pandemic.

[¶67] In our review of the record, we find it is not reasonable to assign a large amount of the delay to the Hunters. All involved in this case bear some responsibility for the delay.[3] As we did in *Dollarhide II*, without opining as to fault, we will note the tortuous pretrial progress of this case is not a model to be followed. 2010 WY 126, ¶ 9, 239 P.3d at 1171.

[¶68] Second, we consider the various violations of the rules of civil procedure. The court stated that the Hunters' counsel violated W.R.C.P. 26(a)(3)(A) because he did not promptly file his initial designation of expert witnesses. Rule 26 does not require the parties to file expert designations with the court. Experts are required to be disclosed to the other party. W.R.C.P. 26(a)(2)(A). Rule 26(a)(3)(A) does require the parties to "promptly file" a witness list with contact information and identify the documents to be presented at trial. Those disclosures are due thirty days before trial unless the court orders otherwise. W.R.C.P. 26(a)(3)(B). In this case, the court set an initial date for those disclosures, but as the trial date moved, the deadlines also moved. From the record, it appears the Hunters complied with the adjusted deadlines. The record does not support a violation of Rule 26 in this instance.

[¶69] The court also found a violation of Rules 56(c)(2) and Rule 56.1(b) and (c), noting the rules require only admissible evidence be attached and the party to submit short and concise statements of material facts with "pinpoint citations to the specific portions of the record and materials relied upon in support of the parties' position." W.R.C.P. 56(c), 56.1(b) and (c). The district court is correct that both the Hunters' statement of material fact and response to summary judgment are deficient. The Hunters' counsel filed a significant amount of seemingly unnecessary material for the district court, and now this Court, to sift through without the benefit of an explanation of how those documents were relevant or admissible. The citations within the documents were not helpful and did not

---

[3] In its order, the district court stated it should have asserted greater oversight over the course of proceedings and not granted all the extensions. Had the court done so, its frustration with the delay could have been expressed and addressed at the time the delay was occurring. The Hunters then would have had better notice that sanctions were imminent and had a chance to address the delays and the court's frustration with them.

assist the district court or this Court in finding the information referenced within the record. We commend the district court for slogging through the excessive documents.

[¶70] The purpose of the rules requiring concise statements and specific citations is to prevent litigants from shifting the burden of organizing evidence to the district court. *See Zimmerman v. Puccio*, 613 F.3d 60, 63 (1st Cir. 2010) (discussing Massachusetts Local Rule 56.1, which requires a concise statement of the material facts, and noting the defendant's failure to provide citations violated the rule). It is not the court's responsibility to make the party's arguments or bring clarity to the evidence; it is counsel's responsibility. Additionally, it is poor advocacy to make the court guess about the party's contentions and try to find relevant facts to support the surmised contentions within hundreds of pages of documents without the benefit of pinpoint citations.

[¶71] Although the Rules of Civil Procedure must be followed and the failure to do so cannot be excused, failures in this regard can be accounted for at the summary judgment stage itself. Rule 56 suggests that very thing. Rule 56(c) provides that a party must cite to "particular parts of materials" in the record and that the district court need only consider the cited materials. Rule 56(e) provides that if a party fails to **properly** address the other party's assertion of facts as required by 56(c), the court may grant the summary judgment. This language allows the district court to disregard the improper documents, accept the movant's facts, and grant summary judgment if the motion for summary judgment shows the movant is entitled to it. Rule 56(e) also allows the court to issue any other appropriate order, which can include other sanctions. Accordingly, the district court can decide not to consider the offending filings as a sanction and otherwise account for the violation at the summary judgment stage.

[¶72] This is not to say that the court's inherent authority cannot be employed to issue some other sanction in the appropriate instance. However, it does suggest that a sanction less severe than outright dismissal should be employed for these types of violations and should be addressed at the time of summary judgment. A better practice is to address violations of this sort at the time of their occurrence and within the context of the summary judgment decision itself.

[¶73] Third, we consider the district court's determination counsel violated Rule 47(c) related to voir dire. As noted above, Counsel did violate the voir dire rules. This violation could provide a basis for dismissal.

[¶74] Fourth, we consider the district court's determination that the Hunters' counsel repeatedly violated and ignored the court's orders throughout the case including during opening statements. We discussed the impropriety of the opening statement above, and counsel's conduct could provide a basis for dismissal.

22

[¶75] The district court noted the Hunters' counsel repeatedly violated other court orders including the court's 2023 motions order where the court stated that granting the request for a continuance was a continuance of the trial date only. No additional discovery or supplementation was allowed. Counsel nevertheless filed an additional designation of expert witnesses and exhibits without leave of the court. The court ordered the parties could not use demonstrative exhibits without the other party's agreement. But the Hunters' counsel still requested to use demonstrative evidence at the trial. The court also noted he filed a motion to reconsider his ruling on experts in violation of Rule 60(b).

[¶76] We have recognized a district court's inherent power to discipline counsel for a failure to comply with its pretrial conference orders. However, ordinarily discipline should involve lesser sanctions than dismissal of the case, such as taxation of costs or some other penalty. *Glatter v. Am. Nat. Bank of Powell*, 675 P.2d 642, 644–45 (Wyo. 1984) (citing 9 Wright & Miller, Federal Practice and Procedure: Civil § 2369, p. 196)). In *Glatter*, we noted the record did not disclose counsel acted in bad faith, nor for delay, nor engaged in dilatory tactics, nor intentionally refused to comply with a lawful order of the court suggesting something more than simple non-compliance with pre-trial orders is needed for the drastic sanction of dismissal. *Id.* We do not find such conduct in the record here. Instead, in our view, the listed violations are a collection of minor transgressions, general misbehavior, or an inept attempt to create an appellate record. *Corley* and *Waldrip* indicate the severe sanction of dismissal is not appropriate for a collection of minor transactions or general misbehavior; a lesser sanction is appropriate. *Corley*, ¶ 29, 547 P.3d at 339; *Waldrip*, 702 P.2d at 1293.

[¶77] Fifth, we consider the violations of U.R.D.C. 801 regarding civility. The district court stated that the Hunters' counsel did not confer in good faith with opposing counsel violating 801(a)(7) and did not reasonably cooperate with counsel as required 801(a)(3). We could not tell from the record whether the Hunters' counsel had not conferred or not reasonably cooperated with opposing counsel. Regardless, his behavior during oral argument alone is enough to support finding a violation of 801. Rule 801(b) requires that counsel's conduct demonstrate respect for the dignity and authority of the court. The Hunters' counsel described the court's rulings as extraordinarily inappropriate, generally ignored the court's directions, and repeated statements the court said it found offensive. Counsel's conduct did not demonstrate respect for the court.

[¶78] Overall, we find that counsel's conduct related to voir dire, opening statement, and civility could provide a basis for dismissal. The question then becomes whether the severe sanction of dismissal is warranted for the conduct. In determining whether to grant the dismissal, the district court cited *Cohen v. Longshore*, 621 F.3d 1311, 1314 (10th Cir. 2010) for the proposition that the court should consider certain factors. Those factors include: "1) the degree of actual prejudice to the defendant; 2) the amount of interference with the judicial process; 3) the culpability of the litigant; 4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and 5)

the efficacy of lesser sanctions." *Id.* (quoting *Olsen v. Mapes,* 333 F.3d 1199, 1204 (10th Cir. 2003)).

[¶79]  However, as also recognized by the district court, these factors "do not represent a rigid test" that a district court must always apply. *Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1323 (10th Cir. 2011) *(citing Ehrenhaus v. Reynolds,* 965 F.2d 916, 921 (10th Cir. 1992)). The factors are instead a non-exclusive list of helpful criteria the district court may wish to consider. *Id.*  We agree these are helpful factors for a court to consider, but the question remains whether the court's ultimate decision is reasonable under the circumstances. *Corley*, 2024 WY 51, ¶ 26, 547 P.3d at 338 (citing *Dollarhide II*, 2010 WY 126, ¶ 4, 239 P.3d at 1170).

[¶80]  The court found that counsel's conduct created a measure of prejudice to the School District, that there was a measure of interference with the judicial process, and that the Hunters bore no culpability for their counsel's conduct.  We do not disagree with the court's assessment of these factors.

[¶81]  However, we cannot agree with the district court's conclusion that it warned counsel that dismissal would be a likely sanction for noncompliance. *See Wearmouth v. Four Thirteen, LLC*, 2024 WY 116, ¶ 24, 558 P.3d 935, 943 (Wyo. 2024) (discussing notice prior to dismissal).  Counsel's poor conduct occurred during the trial, and the record shows the court provided no advanced warning of dismissal during the trial proceeding.  The only mention of dismissal from the court came when it stated it would entertain a request for dismissal after it had already granted the mistrial.  Typically, a mistrial or orders of contempt are assessed as the sanction for misbehavior at trial.  Certainly, the Hunters' counsel had notice of these possible sanctions and one of them, the mistrial, was assessed.

[¶82]  In its order, the district court stated it had warned counsel of the possibility of dismissal at the pre-trial conference.  However, the court's warning related to counsel's request for reconsideration of the court's order excluding expert testimony and eliciting such testimony at trial.  The court's warning at the pre-trial conference is simply not sufficient to weigh this factor in favor of dismissal in this instance when the sanctionable conduct did not relate to the court's expert testimony ruling, and the trial had not progressed to the testimony phase.

[¶83]  The district court also concluded lesser sanctions would not be effective.  However, the order does not evidence specific consideration of the efficacy of any lesser sanctions such as orders of contempt, the assessment of costs, or the assessment of attorney's fees. *See Hancock v. City of Oklahoma City,* 857 F.2d 1394, 1396 (10th Cir. 1988) (citation modified) (stating dismissal is only appropriate where a lesser sanction would not serve the ends of justice).  The court's discussion focused only on its view that the Hunters' counsel showed a propensity not to follow the court's orders, therefore he would not follow any further orders of the court.  The order does not show the court considered the already

24

imposed drastic sanction of mistrial coupled with additional monetary or other sanctions. *See Dollarhide II*, ¶ 16, 239 P.3d at 1173 (discussing the severity of a mistrial sanction). All of these are lesser sanctions that might be effective or at least merit the district court's specific consideration.[4]  Any doubts in this regard must resolved in favor of letting the party have their day in court. *Corley*, ¶ 27, 547 P.3d at 338.

[¶84]  Overall, we find that the tenor of the court's order creates the appearance of rounding up multiple transgressions or general misbehavior to show that counsel's conduct was extreme enough to warrant a dismissal sanction in addition to the already imposed mistrial sanction.  However, the record does not reflect an outright refusal to comply with the court's discovery orders like that present in *Corley*.  We found no evidence of egregious discovery violations or a history of discovery violations like those discussed in *Groskop*. *See Groskop as Tr. of Black Diamond Liquidating Litig. Tr. v. S&T Bank*, 471 P.3d 274 (Wyo. 2020).  We also do not see the severe litigation abuses such as fraud, falsified exhibits, and perjury like those noted in the cases cited in *Dollarhide II*.  Although counsel's conduct at trial showed he refused to follow the court's trial instructions and rulings, much of that behavior is accounted for in the mistrial sanction.

[¶85]  On the balance, we find this case does not demonstrate the extreme situation warranting dismissal and the sanction of dismissal goes beyond the necessities of this case. *Waldrip*, 702 P.2d at 1293.  We have said the decision of the trial judge will not be reversed unless there is a firm conviction that a clear error of judgment was committed. *Id.* (citing *United States v. Sumitomo Marine & Fire Ins. Co., Ltd.,* 617 F.2d 1365 (9th Cir. 1980)). We have the definite and firm conviction that a clear error of judgment was committed. The district court's order of dismissal is reversed.

## CONCLUSION

[¶86]  We affirm the district court's orders on expert witnesses and summary judgment. We reverse the district court's order on dismissal and remand the case to the district court to consider some other lesser sanction for the violations committed by the Hunters' counsel.

---

[4] The Uniform Rules for District Courts particularly mention the assessment of costs after a mistrial, indicating that these are typical sanctions following a mistrial. U.R.D.C. 503.